PERMISSION TO COPY DENIED, HRS 606.13, etc.                 7

          That prior to the incident in question, the Defendant was taking the drug Tegretol.

          That one of the side effects experienced by the Defendant as a result of taking Tegretol was impotence, and that Defendant was impotent at the time of the incident.

          THE COURT:  Mr. Bakke, are you willing to stipulate at this point?

          MR. BAKKE:  Yes, Your Honor.

          THE COURT:  Any other evidence, Ms. Courageous?

          MS. COURAGEOUS:  Yes, Your Honor.

          At this time I call to the stand Domingo Ruiz.

          THE COURT:  Come forward, sir.  Come right up to the witness stand, remain standing and raise your right hand.

DOMINGO RUIZ

called as a witness by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. COURAGEOUS:

    Q.    Yes.  Would you state your name for the record, please.

    A.    Domingo Ruiz.

OFFICIAL COURT REPORTER
STATE OF HAWAII

EXHIBIT 2

PERMISSION TO COPY DENIED, HRS 606.13, etc.          8

```
1       Q.     Mr. Ruiz, are you employed right now?
2       A.     Sudkara (phonetic) it's a bar.  I'm a
3   bartender.
4       Q.     Now, on July 1, 1996, is it correct that you
5   witnessed an incident that involved the Defendant here?
6       A.     Yes, ma'am.
7       Q.     And you do recognize this Defendant as having
8   been present at that incident?
9       A.     Yes, ma'am, I do.
10      Q.     Okay.  Would you then please tell the Court,
11  what -- where you were at the time when you first learned
12  of this incident?
13      A.     I was at the building next door.  I heard
14  some lady screaming, and my friend and I ran outside, and
15  we saw him and some lady in the parking lot.
16      Q.     What was the name of your friend that you
17  were with?
18      A.     Let me see, Mexican guy, Rojelio, I think,
19  Rojelio.
20      Q.     Now, where exactly were you and Rojelio?
21      A.     This happened on the Ala Wai, so we were
22  like -- would be like south or makai from the building,
23  makai, next to the building where they were on -- of
24  course, the left side of the Ala Wai.
25      Q.     Okay.  Are you saying, then, that the
```

PERMISSION TO COPY DENIED, HRS 606.13, etc.                 9

1   building that you and your friend were in was directly
2   adjacent to the building?
3        A.    Next door.
4        Q.    Next door to, okay. And what floor level
5   were you on?
6        A.    First floor.
7        Q.    Okay. And after you heard the woman
8   screaming, how long did it take for you to arrive to where
9   this incident was occurring?
10       A.    One minute. Screaming real loud, right
11  outside, seemed like something was happening.
12       Q.    Okay. And after you ran outside and you saw
13  the Defendant, what else did you see?
14       A.    Okay. He was standing up. He was trying to
15  walk away. The lady was laying down, and she was pulling
16  his pants down. She was grabbing onto his leg, and he was
17  trying to get away from her.
18       Q.    Was there any argument going on?
19       A.    Definitely. She was cursing him out, and he
20  was trying to get her hands off him.
21       Q.    Okay. What was the Defendant doing at that
22  time?
23       A.    He was trying to free himself from her. She
24  was pulling his pants, grabbing on his leg. She was
25  hitting his hands, kept grabbing off of her.

OFFICIAL COURT REPORTER
STATE OF HAWAII

<u>PERMISSION TO COPY DENIED, HRS 606.13, etc.</u>      10

```
 1              THE COURT:  Excuse me.  Mr. Ruiz, could you
 2   speak a little slower.
 3              THE WITNESS:  I'm sorry about that, sir.
 4              BY MS. COURAGEOUS:
 5        Q.    Okay.  Which leg was she holding onto?
 6        A.    Right leg.  She was on right side, on the
 7   right side.
 8        Q.    What was the -- was the Defendant saying
 9   anything at that time to her?
10        A.    He was, yes, he was, ma'am.
11        Q.    What was he saying?
12        A.    Can I repeat it?
13        Q.    Well, yes, you can.
14        A.    Well, something to the effect, get off me
15   bitch, or you know, get the fuck away from me or something
16   like that, excuse my language.
17        Q.    Okay.  Now, you testified that he was
18   slapping at her hands trying to get her away?
19        A.    She was pulling on his pants, so his leg --
20   she was holding onto his leg, pulling his pants.  He was
21   trying to get his hand over her, but she kept grabbing
22   him.
23        Q.    Okay.  Did you at any time see him strike
24   her?
25        A.    He hit her on the hands.  He hit her hands,
```

<u>PERMISSION TO COPY DENIED, HRS 606.13, etc.</u>         11

1  but not her face.
2      Q.    In the process of pulling at his shorts, did
3  you see his shorts actually come down?
4      A.    No, ma'am.
5      Q.    Did you see any of his private parts exposed?
6      A.    No, ma'am.
7      Q.    So how long were you and your friend there
8  watching this incident?
9      A.    I would have to say about, like, I don't
10 know.  About a minute, minute-and-a-half when the police
11 came.  I figure they'll handle it, so I left.
12     Q.    All right.  Did you or your friend try to
13 stop this altercation in any way?
14     A.    No, ma'am, we did not.
15     Q.    Why didn't you?
16     A.    We were in front of them.  She wasn't asking
17 for help or nothing.  They looked like were kind of
18 arguing.  I mean, he wasn't hitting her or nothing.  I
19 didn't think we should get involved.
20           He was trying to walk away from her.  She was
21 grabbing onto his leg, so I mean, I don't see how I can
22 help either one of them.
23     Q.    Okay.  Did anyone of the two appear to be the
24 aggressor?
25     A.    I mean, they -- he was trying to leave is

OFFICIAL COURT REPORTER
STATE OF HAWAII

PERMISSION TO COPY DENIED, HRS 606.13, etc.        12

```
 1   what he was trying to do, and she was holding onto his
 2   leg.  I don't know.
 3        Q.    At any time did this woman tell you that she
 4   was being attacked or being sexually assaulted?
 5        A.    No, ma'am, she did not.
 6        Q.    Did at any time she ask you or your friend to
 7   step in and help her?
 8        A.    No, ma'am, she did not.
 9        Q.    During this scene, did you see her at any
10   time try to get away from the Defendant?
11        A.    No, ma'am.  She wasn't trying to get away.
12        Q.    Was there anything in her behavior that
13   suggested that she was afraid of the Defendant?
14        A.    No, ma'am, I don't think so.
15        Q.    Did either one of these individuals appear --
16   act as if they were intoxicated?
17        A.    They both looked like they were, absolutely.
18   They looked like -- they looked intoxicated, both of them
19   did.
20        Q.    What in their conduct led you to believe that
21   they were intoxicated?
22        A.    Well, the slurred -- I spoke to him, was that
23   you better get out of here, and the way he was talking,
24   the way he was slurring -- I'm a bartender.
25              I can tell when people are drunk pretty much.
```

<u>PERMISSION TO COPY DENIED, HRS 606.13, etc.</u>         13

1   They looked like they both were drunk, both of them.
2        Q.   What was there in the lady's conduct that
3   would lead you to believe that she was drunk?
4        A.   If she would have just let go of his leg, he
5   would have left. She kept hanging onto him. She was
6   cursing while everything was going on. If she would have
7   let go, he would have left. He couldn't move, she kept
8   trying to pull him around.
9        Q.   Now, in the course of this lady being on the
10  ground and the Defendant being standing up, can you
11  describe with a little more detail what he looked like as
12  he was standing up? In other words, was he standing over
13  her? Was he bent over? Was he straight, what?
14       A.   Okay. He was standing with his legs to the
15  side, right. She was on his right side hanging onto his
16  left hand, pulling on the T-shirt.
17            He was trying to get away from her grabbing
18  hands, hitting hands, pushing away. But I guess, you know,
19  she just kept hanging on. That's what I saw.
20       Q.   Did he appear to be bent over at all at any
21  point?
22       A.   No, nope.
23       Q.   When you were observing this incident, beside
24  Rojelio, did you see anyone else standing in the proximity
25  of the incident, observing it?

<u>PERMISSION TO COPY DENIED, HRS 606.13, etc.</u>                14

```
 1        A.    I don't even know.
 2        Q.    How far would you say?
 3        A.    10 feet, closer than we are right now, you
 4   and I.  10 feet, I mean, we were right there in front of
 5   him.
 6        Q.    Could you guess in terms of 5 feet, 10 feet?
 7        A.    Seven to 10.
 8        Q.    Seven to 10?
 9        A.    About that close, 7 to 10.
10        Q.    And you've testified that when the police
11   left -- came, that you left; is that correct?
12        A.    Yes.
13        Q.    Why didn't you stay at that time?
14        A.    I didn't want to get involved in none of
15   that.  The police were there to -- the mall police
16   cushman, I'm sure they could have handled it.  Nothing
17   was happening.  He was trying to walk away.  She was
18   grabbing him, so I didn't see nothing happen.
19        Q.    Did you have any thought at that time that
20   the Defendant was going to be arrested for any offense
21   involved in this?
22        A.    I didn't, no.  I mean, you know, they were
23   fighting, I'm sure the police just wanted to stop the
24   fight.  I didn't think so, no.
25        Q.    Okay.  Were you aware that the Defendant had
```

PERMISSION TO COPY DENIED, HRS 606.13, etc.            15

```
 1   actually been arrested for --
 2        A.    No, ma'am.
 3        Q.    -- a crime in this matter?
 4        A.    No, ma'am, I didn't stay.
 5        Q.    At the time that you saw the Defendant, did
 6   you know his name?
 7        A.    I seen him before, but I didn't know his
 8   name.  I seen him before.
 9        Q.    Where had you seen him?
10        A.    I think my wife works at the -- at the Hilton
11   Hawaiian Village, Fort DeRussy, Atlanta Submarines, and I
12   think I seen him with the birds.  He did something with
13   the birds down at the beach.  I seen him before.
14        Q.    But didn't know what his name was?
15        A.    No.
16        Q.    Okay.  Were you -- was it ever brought to
17   your attention that the Defendant had actually gone
18   through a trial --
19        A.    No, ma'am.
20        Q.    -- regarding this incident?
21        A.    No.
22        Q.    And how is it that you found out that the
23   Defendant had been convicted of this crime?
24        A.    I would say about four months later I went
25   to jail for two days for a domestic dispute, and I seen
```

OFFICIAL COURT REPORTER
STATE OF HAWAII

<u>PERMISSION TO COPY DENIED, HRS 606.13, etc.</u>            16

```
 1    him in there.  And I recognized him, and I talked to him
 2    for a little bit.  And then he explained to me that he had
 3    been arrested for attempted rape or something like that.
 4              MS. COURAGEOUS:  Okay.  Thank you.  No
 5    further questions.
 6              THE COURT:  Mr. Bakke, any questions?
 7              MR. BAKKE:  Yes.
 8                     CROSS EXAMINATION
 9              BY MR. BAKKE:
10         Q.   What facility were you placed in for that two
11    days?
12         A.   OCCC, sir.
13              MR. BAKKE:  Thank you.  No further questions,
14    Your Honor.
15              THE COURT:  Anything further?
16              MS. COURAGEOUS:  No.
17              THE COURT:  Thank you, sir.  You may step
18    down.
19              Any further evidence from the defense?
20              MS. COURAGEOUS:  Your Honor, I have filed in
21    this court also a statement of filing to which I attached
22    a pamphlet, a copy of a pamphlet from Queen's Medical
23    Center on the drug Tegretol.
24              THE COURT:  Do you have another copy that
25    could be marked and be produced?
```